Case No. 18-2253, Crossing at Eagle Pond Apartments v. Lubrizol Corporation et al. Arguments not to exceed 15 minutes per side. Mr. Rucker, you may proceed for the appellant. Thank you, Your Honors, for hearing this case today. It arrives out of a diversity of jurisdictions, so you're hearing some Michigan tort commercial law and real estate law today. I tried to learn how to raise this up, so I hope I'll keep eye contact with you, but I'm going to be looking down at my notes a bit here. I would like to reserve three minutes of time for rebuttal, Your Honors. The facts of this case is that Eagle Pond bought an apartment complex that had already installed plumbing years before. That plumbing, a component of it, was defective, and certain one-inch thick vertical pipes failed. Those pipes are supply pipes. They're in the walls. They run through the ground, and it created a significant amount of damage. The issue arises before this court because it was dismissed on summary judgment based on the application of the economic loss doctrine, as well as the court found the statute of limitations had run under the product's liability law. The economic loss doctrine applies to commercial transactions, and there are two bases that the court looked at and that courts look at to apply the economic loss doctrine. One is privy of contract. The judge below found that there wasn't privy of contract. Eagle Pond was not in privity with Lubrizol or the company to whom Lubrizol sold its product. The court did find that there was a commercial transaction in goods, and that is another basis. Do you think we have to apply Michigan ball, though? I think that the economic loss doctrine is somewhat state-dependent on its scope, and the way I read the restaurant case, Citizen Insurance, it didn't require privity of contractor, that they were two contracting parties. So how would you distinguish that case? Well, I don't necessarily need to distinguish it, Judge. I think there are two ways it could apply. It could apply through privity. I was just eliminating that, so it doesn't apply through privity here. It could also apply through a commercial transaction in goods. So in the Citizen's case, the economic loss doctrine applied through both. They had both privity and the commercial transaction in goods because the restaurant owner there, Kim's, was in privity with the party who was repairing a deck, I believe, and there was a component to that repair that was defective. So they had both privity of contract and a commercial transaction. I'm not getting at privity of contract to say there's no other way. I'm just eliminating that as the way here. But dealing with the commercial transaction in goods, the court below found that there was a commercial transaction in goods, but in Citizen's, in particular, it was a good. They were selling a product to put on the deck to the owner, to the person who was the plaintiff in that case. In our case, there is no transaction in goods that Eagle Pond has participated in. They have participated in a real estate transaction. But is the issue what the plaintiff has participated in, or is the issue what the defendant has participated in? Isn't it the sale by the defendant that matters? Well, I look at a number of things in respect to that, Your Honor. I look at quest diagnostics where it says the parties to the litigation were involved either directly or indirectly in a transaction for goods. So the parties to the litigation were not engaged in a transaction for goods. The other thing I look at is that the cases talk about bystanders and strangers. Eagle Pond was a stranger to that transaction in goods. It had no opportunity to bargain, no opportunity to negotiate for something that would protect it. And that's what these cases are looking for. They say in commercial law, if you have the chance to negotiate and the chance to bargain for protection, then the economic loss doctrine should apply. I get a little worried, though, by that idea that, like in Citizen's insurance, it would have come out differently if after the relevant negotiation, all the restaurant did was sell. Suppose the restaurant was like, okay, we're going to be stuck with the economic loss doctrine if we sue them. Let's sell to somebody else. That other person can come in and then sue because there won't be any direct relationship. So wouldn't your view in some respects allow parties to manipulate things to avoid the economic loss doctrine? Well, I don't believe in manipulating circumstances, but I think that if you're a seller of goods that have a long lifespan and you believe that, for instance, a plumbing material that should last decades, the property may be sold, you can protect yourself through contract law. You can seek indemnification from the person who is involved in the commercial transaction. What I don't think we should do is I don't believe the federal court should expand the reach of the economic loss doctrine to real estate transactions, and that's my primary concern with how the judge ruled. And I will point the court to a case. I found a case through Lexis that I hadn't found before because it's listed under pleadings, briefs, and motions. It's not listed under cases. I don't know if it was filed improperly, but it's a case from Judge Maloney, the chief judge out of the Western District of Michigan, and it's called Encana Oil and Gas versus Aremba Family Farms. It's Western District of Michigan, case number 12CV369. It's from December 3, 2013, and he was dealing with a lease, and I would like to be able to submit that if your honors will allow me to in a supplemental. I did present the case to counsel. I found it within the last couple of days. But in that case, there was a lease. It revolves around a lease that was to obtain oil and gas from a farm, and part of the issue is a 30-something page opinion, but part of it had to do with the application of the economic loss doctrine. Well, oil and gas are things that can be severed from the land and are intended to be taken from the land, and so they do qualify as goods. The plumbing components here were never intended to be severed from the land. They became part of the real estate. So in that case, you truly had the sale of real estate or the lease of real estate. You had a real estate transaction with an underlying good, and the court, Judge Maloney, found in that case that Michigan has not extended the economic loss doctrine beyond the sale of goods to the sale of real estate, and I think that's important. I do agree with you that the Michigan Supreme Court has not said one thing or the other on it, but isn't it our job to predict what the Michigan Supreme Court would do? So why do you think the Michigan Supreme Court would not extend it? I could see arguments for why it would, because whether it's a sale of goods or a sale of real estate, I don't think matters with the underlying idea that in the contractual context, both of them are contracts, parties should just protect themselves by putting terms into the contract. Why wouldn't that general rule extend to real estate? What's about real estate that makes it unfit for? Sure, I can get to that in a couple of ways, but I think Nieburger said commercial transaction and goods, so it was limiting it, and it was dealing with the UCC. I would also point the court to the Ditzek case, which I cited, which is a Michigan court of appeals. Bennett is a court of appeals. But they're published cases that are standing for the proposition that the UCC and the Uniform Commercial Code and the defenses arising out of it don't apply to real estate transactions. But I would also go back to the Hornbook Law about how commercial law arose, and it arose from maritime merchant law. They didn't want to be bound by – they came to a certain port or they came to England. They didn't want to be bound by the common law of the land because it didn't allow them to engage in transactions in various places. And so a different set of laws rose up for merchants, and it was in competition with the law of the land, the common law that dealt with property and real estate. So they really did arise in different ways, and the UCC came out of that. So I think real estate has its own – it's unique. But does that apply in the context of these commercial sales of real estate? Because isn't there the capacity when this – when the apartment complex was purchased, isn't there generally the opportunity in that contract to protect one's – as purchaser, to protect yourself regarding all the component parts of what you're purchasing? Well, I would respond to that in two ways. One is that you're not purchasing goods. So, again, I'd just like to circle back to the point that I prefer that the federal court not expand Michigan law because there is a recourse. There's a recourse to products, liability, defenses, and just to go that route. But the other component of that is that – and I – can you repeat the question? I had the other component of it, and it escaped when I – I was just trying to say that if the question is whether you can – who is responsible to protect themselves by contract, even if you're not in privity, even if we can exclude that, then isn't the protection by contract for a real estate entity the purchase in the contractual purchase of the real estate? The other difficulty there is, for instance, in this case, the failure, the defect was not apparent. It did not arise until after the purchase was taking place. So certainly if there is something – Well, I think your opposing counsel argues that there were indications that there had been plumbing problems and that the seller said there had been plumbing problems and that they thought that they were typical plumbing problems that they could buy without any additional contractual protection. Right, and that may get into the issue for the statute of limitations, whether there were these thinner return pipes that broke that were normal run-of-the-mill issues that come up in apartment complexes versus this defect in the supply line. So in this case, the defect in the supply lines, which are the thicker pipes, didn't occur until later. And so even – Didn't your client testify that there were four instances, all of which were the problem, and the first ones are the supply lines that would cause the statute to run for you? My client didn't testify that they were all the same problem. There were the normal standard problem of these return lines that break when – because they're exposed, they're thin, and they deteriorate without defect as a matter of course. And he dealt with 50 different apartment complexes over 30 years. Only two of those apartment complexes had these defects in the supply lines, the thicker supply lines. So I think when you're looking at the issue of what these return lines, how they compare to the supply lines, it's really apples and oranges. And the other issue is there's no evidence in this case that Lubrizol's component was in those return lines. I thought that was a great point, but I didn't find any evidence in the case that Lubrizol's components were in any of these pipes. Well, the experts actually tested – we had experts that tested the supply lines, and Lubrizol's components were in there. You just didn't have the expert test the other lines, too? I'm not aware of under what circumstances they made those tests, but I – And where can I find that in the record? Where can you find the – the connection of the Lubrizol at all to any of the pipes? Your Honor, I will have to supplement because right off the bat I – so I will make a note. But we did have experts test – I believe your time there is up. You've got ice cream on for a little bit, unless you'd like to take some time from your rebuttal time. Can I take one more minute to deal with the statute of limitations? All right. One minute from rebuttal. Well, just one more minute out of my rebuttal time, so two minutes later. Yes, yes. Thank you, sir. What I would mention out of the product – from the product's liability statute of limitations is that it is also a question of fact for the jury whether those two harms are the same harm. And really I believe the judge below looked at the issue and decided that question for the jury. It is not purely a legal question whether those – whether those pipes had the same defect. And as your Honor was getting to, it's an issue for – at least your question raised the issue. It's a question for the experts to bring before a jury to say, was this component in there? Is there evidence that this component was in there? And are they the same harm? And I would submit they aren't. And I would ask the Court to really avoid extending Michigan law on this issue.  Thank you. Good morning. Good morning. Hi, Jeff Lauderdale. I represent the defendant at Feliz Lubrizol Corporation and Lubrizol Advanced Materials, Inc. The result below was dictated by clearly established Michigan law. In order to even make an argument to the contrary, Eagle Pond has to ignore a host of Michigan Supreme Court and appellate court decisions and simply pretend that they don't exist. Eagle Pond also has to ignore the facts of this case and pretend that their owner, Adam Bleznak, didn't testify the way that he testified. There is no genuine issue of material fact here. Summary judgment was appropriately issued below and Judge Hood got this right. I want to start, if I may, by explaining or at least reminding the Court who my clients are. My clients, Lubrizol, are a raw material manufacturer. They're chemical companies. They make compounds, chemical compounds that come either in pellet or powder form. Lubrizol doesn't make pipes. They don't make fittings. They don't install pipes. They don't sell real estate. Lubrizol played no role in the construction of this building and didn't even know it existed until sometime in 2015 when Eagle Pond told us they were going to sue us. Lubrizol instead sold a chemical compound in a commercial transaction way back in 1998 or 1999. They made a sale to a company that makes pipes, plumbing pipes, and then got dragged into a lawsuit 17 years later by somebody other than the customer to whom they sold their compounds when their customer, the company that made the pipes, when their product failed apparently. Would you say that there's a string of contracts connecting you all the way through so you would have contracted with a plumbing company? We would have contracted with a pipe manufacturer. And the pipe manufacturer would have contracted with a developer or the general contractor? There's probably a few steps in between there. The pipe manufacturer probably has a distribution network so it would contract with a distributor. It would probably contract with another distributor. Ultimately there would be a fabricator, a general contractor, an installer, and ultimately the building purchaser, the builder. So there are a series of numerous contracts and everybody has a contract and everybody is a commercial entity who has the power to protect themselves upstream. And that's exactly what we're dealing with here. But the claim against us here essentially is claiming by way of tort that we, Lubrizol, must have breached our contract with our customer back in 1998 or 1999. And this is exactly what the economic loss rule was made for. And as I think your honor alluded to, the economic loss rule is settled in Michigan. There's plenty of case law on it and there's not a lot of room for argument here. You cannot sue an upstream raw material supplier in tort for property damage. This is the law, actually not only in Michigan, but this is virtually the law in every state of the country. Is there a distinction between merchants and consumers for purposes of this rule? Not in Michigan. In a lot of states there are. If I just bought a can of soup from Kroger and the soup blew up my house, would I be able to sue Campbell Soup? You're just talking about property damage or are you injured? No, property damage. In Michigan you cannot sue Campbell Soup. In some states you can. But if you are a business and that happens, or if you are a distributor of soup and it's a commercial transaction and you bought that soup as part of your business or a commercial kitchen or something. What case in Michigan says that there's no distinction between merchants and ordinary consumers? That's not our case. We don't have a consumer in this case. I believe that Niebarger itself has some language related to that. There are definitely some of the courts of appeals decisions that have followed up on Niebarger that make that point, but I'm not prepared to answer that question since that isn't our case here. But I know that there are cases that have said that the consumer distinction does not apply in Michigan. But to be clear, we're talking about commercial entities here. That's what we have here. Eagle Pond is a commercial manager of apartment buildings and other types of buildings, so there is no doubt that they are a commercial entity. But such claims in Michigan are solely the province of contract law and or the Uniform Commercial Code, the UCC. And what happened here, stated simply, is that the plaintiff dropped the ball. Mr. Bleznak, Eagle Pond's owner, testified that there was an investigation period. There was a negotiation period. He talked at length about leaks with the party from whom they bought the building. And ultimately, at the end of the day, they said, hey, this is typical stuff. They even talked about leaks. He asked about leaks, and they said, yeah, we've had leaks. He didn't investigate them. I asked him at deposition, did you hire a plumber? No, I didn't hire a plumber. We do this all the time. This is what we do. We know what we're doing, and we know how to do it. So Eagle Pond didn't protect itself in the contracts that it made with the people from whom it bought the building, which was a previous commercial manager of real estate, the same as they are. And that's its own fault. It could have protected itself by contract. It could have written a lot of things into that. It could have retained liabilities into the contract. It's very easy to do, and it's very standard. It could have said, look, you told us that there's leaks in the plumbing system. We're not taking the liability for that. If something turns out to be bigger than what we think it is or something that we can't handle, especially since we're not going to go out of our way to do anything to investigate them right now. We're not going to hire a plumber. We're not going to do anything else. Those are going to be on you, seller. And then they pass the liability on the seller, and that's how they protect themselves. They don't go after upstream manufacturers. I'm sorry. Would you agree that the Michigan Supreme Court at least has not reached a conclusion on whether the economic loss doctrine should extend to real estate? It doesn't matter in this case. I would agree with you on that, but it doesn't matter because my client doesn't sell real estate. My client sold a chemical compound, a good, back in 1998 or 1999. And there is no real estate transaction that is relevant to this case. In Michigan and in most other states, the focus of the economic loss rule is always on the product the defendant sold, not on the product the plaintiff bought. We don't sell real estate. We didn't even know this building existed. We sold a compound as part of a commercial transaction that was governed by the UCC to our customer back in 1999. And so the idea of whether or not the economic loss rule would apply if Eagle Pond were trying to sue the actual party that sold at the building for a defective building, that's not my issue. And I would agree with you that the Michigan Supreme Court hasn't touched on that issue, whether or not real estate is good. What's the best case that suggests when you're a manufacturer of a product, but the entity that's suing you does not have a direct contract with you, it's like the chain of contracts we talked about, that it would still apply? That lack of, that privity doesn't matter? Yeah. What's your best case for that? Well, every case says that. Nieberger said that because one of the defendants in Nieberger, which is the seminal Michigan Supreme Court case, didn't have privity. They sued a designer in there as well as the installers. It was like milking, whoops, I'm sorry, milking products. And so there was a defendant in there that didn't have privity. That was more direct, wasn't it? Because it was, I thought it was somebody who was implementing a dairy machine and there was some direct relationship there between the farm and the dairy machine. One could argue that, but the Court of Appeals cases that have followed Nieberger have followed up on that and said that Nieberger pulled out the privity requirement. So Citizens Insurance addresses it directly. That was a direct argument that the plaintiff in Citizens Insurance made. And the court said, nope, no privity requirement here. Doesn't matter, economic law still applies. Affiliated FM, which we also call Motor City Stamping because there's insurance involved there, that case says the same thing. There's a case called MASB-SEG, which is an insurance company, Metalux is the defendant, says the same thing. All of those cases, there's a case called Freeman, there's a case called Sullivan, all that are cited in our briefs, all of which. So I think most of the cases I looked at, at least it seemed like it was only one or two levels and this seems like it's several levels removed. Do you think that there's any distinction to be drawn there? I can't imagine why that would matter. I think distribution networks are set up differently in different industries and whether it's one, two, three steps in the chain or seven, I can't see why that would matter. And here, to be honest, we don't even know how many steps are in the chain because we sold our product back in 1999. We know who we were selling product to back then and to your Honor's point, we don't even know that our product is actually in this building, but that's a different issue. But assuming it is, we would have sold our product to our customer and then how they distributed it downstream and how it actually got in this building, we have no idea. We just know that this is a building that has plumbing pipes in it made out of CPVC. Whether it's our CPVC or not, we don't know. Why didn't you move for summary judgment on the fact that they don't have a genuine issue of material fact on whether it's your product in any of the pipes? Because I didn't need to. Economic loss rule got me where I needed to go. How would you respond to the point that there's an expert analysis suggesting that your product was in the pipes? Is that in the record? Expert reports were exchanged. Were they submitted in the record? No, they're not in the record. We never got that far. They did submit an expert report. It talks generally about CPVC. I don't know that they ever said that or were ever able to definitively say it was our CPVC. We have competitors. We submitted an expert report in response that said this is not even a material failure in the CPVC. Even if it is ours, it's an installation problem with the way that this installation was set up. But none of that's in the record. To answer your question directly, the economic loss rule was clear cut here. We didn't need to get into summary judgment on whether our material was in the building because that's harder to do really. So we took the easy path and made it easy for Judge Hood. That got us where we needed to be. But ultimately, your honors, if Eagle Pond thinks that it bought defective components in a building, it had remedies against the company that sold it the building. Setting aside those policy type arguments, it's pretty clear under Michigan law that it doesn't matter what the plaintiff bought. It only matters what we sold. Second, along those same lines, the real estate here is not what the defective product was. That's not what the allegation is. The allegation is that the CPVC, chlorinated polyvinyl chloride compounds that we sold, probably, that went into the pipes is the defective product. And so you have to look at what the defective product is when you're determining whether or not the economic loss rule applies. And here, again, the defective product is a good. It is not a building. It is not a defective building that's falling down. It is a good, a specific good that plaintiff claims is the problem. And that's why we are the only party they sued. They didn't sue anybody else in this chain because they're trying to claim that this product, 17 years after the fact, is the issue. And so plaintiff's attempt to focus on real estate here is really a red herring. Michigan law is clear that the focus always remains on the product that the defendant sold. Otherwise, as Your Honor pointed out, you can create liability simply by selling somebody's product along with a piece of real estate somewhere down the line. And that's just not the way that the law is set up, and it doesn't allow you to manipulate facts in that way. If the plaintiff's theory were to be believed, then when there is an economic loss rule problem, all you have to do is just affix it to a building and sell it, and then all of a sudden you can create liability for that defendant out of thin air with a new plaintiff. The case law on this topic is pretty clear. We've cited them, and I've mentioned a few of them. And these are the same cases. There are many Michigan cases in which Michigan courts have found that the economic loss rule controls, even though the defendant's products were incorporated into some kind of real estate transaction. That's the Metalux case, M-A-S-B-S-A-G. The defendant's product in that case was a light fixture. The plaintiff bought the building. Citizens Insurance, the defendant's product there was chemicals just like ours, chemicals for the treatment of wood. The plaintiff in that case, though, contracted for construction services and bought trusses and decking. They didn't buy the chemicals directly. It was a real estate transaction. This is the Motor City Stamping case, Affiliated FM it's also called. Again, that's another light fixture case. Plaintiffs there bought the building. And there, in fact, the court went deep into the analysis of which transaction you look at, the defendant's transaction or the plaintiff's transaction, and said in no uncertain terms that you look at the defendant's transaction. And it found for the defendants in that case. That was a Michigan Court of Appeals case. In fact, the plaintiff has not provided one single case where any Michigan court has bought their theory and said that the economic loss rule does not apply when the defendant's product is incorporated into a piece of real estate. Do you think we have to disagree with the trial court case that involved, I think it was the manufacturer, but the trial court seemed to say that the economic loss doctrine didn't apply. The circuit court case, I'm linking on the name if you know what I'm talking about. Can you help me out a little more? Tell me the case, I'm not sure. River. Oh, Riverhouse. Yeah, Riverhouse. Well, Riverhouse is more on the... It seemed like it was analogous circumstance. It was piping that was in the apartment complex. And I thought the circuit court... Well, Riverhouse, you don't have to disagree with it because Riverhouse was wrong because it confused the Michigan law regarding the consumer versus commercial distinction. In Riverhouse, the claims were brought by end users, consumers, and it found that that's why the economic loss rule didn't apply. But that's not our case. If we did have a consumer case, I'd probably be up here arguing that Riverhouse was wrong because it is. But you don't have to disagree with it because it's distinguishable on its face. It was condominium owners, now that I think about it. Correct. Yeah, so you're talking about the end users, not a commercial buyer that brought that case. I'd say it's irrelevant to our case because it's not what we're dealing with. So I see I'm almost out of time. Just real quickly on the statute of limitations issue. Mr. Blesnack testified that there were four major failures, and he conflated them all together. We didn't make that up, and that's what the district court found when Judge Hood found that the statute of limitations had also run. It's not our burden to prove that our product was not in the first two leaks. Mr. Blesnack conflated them. I'd ask that you affirm. Thank you. Thank you. Rebuttal? Yes, Your Honor. I'd like to deal with the cases that counsel referred to. One is the Metalux. The Metalux was a school that entered into a commercial transaction for light fixtures. Their subrogee sued, and so I don't believe there was a change in interest. It was somebody on behalf of the school. I've already discussed Citizens. It was the same owner. There wasn't a real estate transaction in the middle of that. Affiliated, there was a real estate transaction. All these cases are from 1998, by the way. The case I cited, the Encana, is from 2013, which says Michigan doesn't apply the economic loss doctrine to real estate transactions. As is the Bridgewater. It's a much more recent case. But the case's defense site are from 1998, and in 20 years they haven't found one, a published case, where they apply that doctrine to real estate. The Affiliated was an unpublished case where light fixtures were installed, and the new building owner obtained a ruling. It sought liability, but their liability was barred by the economic loss doctrine. But the court in that case relied on a U.S. Supreme case called Saratoga Fishing. Saratoga Fishing had a hydraulic system that was added to a ship, and then the ship was resold. A ship is a movable good. It qualifies as a good. That is different. And Affiliated was, the court there was, they incorrectly relied on the transfer of a ship and compared it to the transfer of real estate because a ship is a good. So I disagree with counsel's representation that all the law favors their position on this. I think it does not. In fact, what I've had to do is go through and prove a negative. The negative is that there isn't law out there where there's a real estate transaction in the middle, and then you apply the economic loss doctrine to the person who was the purchaser of real estate. Except that I did find the Encana, and they did say that Michigan law does not apply economic loss doctrine to real estate. And then in terms of the timeframe, again, the 17 years that was raised over and over, the parties, the plaintiff, only gets three years from the time of the harm. They are still protected by whether they timely make their product liability claim. And a company that produces a substance that they know is going into plumbing that will be used for years, decades, they should be aware of that. And if they want to protect themselves, there are plenty of ways to do it without limiting an area of law such as tort law, by increasing the scope of the economic loss doctrine where the Michigan courts have not done that. And I'd ask the court to overturn the decision as to the statute of limitations and as to the economic loss doctrine. Thank you. Thank you very much. And the case is submitted.